```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE
              SOUTHERN DISRICT OF MISSISSIPPI
 2                    EASTERN DIVISION
    _____
 3

 4   MARQUIS TILMAN,
 5        Plaintiff,
 6
     VS.                 Civil No. 2:20-cv-10-KS-MTP
 7
 8   CLARKE COUNTY, MISSISSIPPI, et al.
 9
          Defendants.
10   _____
11
12
13                     DEPOSITION
14                        OF
15                   JUSTIN RAWSON
16                 SEPTEMBER 29, 2021
17
18
19
20
21
22
23     ALPHA REPORTING -- A VERITEXT COMPANY
                    236 Adams Avenue
24              Memphis, Tennessee 38103
                    901-523-8974
25                  www.Veritext.com
```

Page 1



Alpha Reporting  
A Veritext Company  
800-556-8974  
www.veritext.com

## Page 2

1  The deposition of JUSTIN RAWSON is taken
2 on this, the 29th day of September 2021, on
3 behalf of the Plaintiff, pursuant to notice and
4 consent of counsel, beginning at approximately
5 3:30 p.m. via Zoom video conference.
6  This deposition is taken pursuant to the
7 terms and provisions of the Federal Rules of
8 Civil Procedure.
9  All forms and formalities are waived.
10 Objections are reserved, except as to form of the
11 question, to be disposed of at or before the
12 hearing.
13  The signature of the witness is not
14 waived.

## Page 3

APPEARANCES

FOR THE PLAINTIFF:
 CARLOS MOORE, ESQ.
 Cochran Firm
 306 Branscome Drive
 Grenada, Mississippi 38902
 601-227-9940
 cmoore@cochranfirm.com

FOR THE DEFENDANT:
 JESSICA MALONE, ESQ.
 Allen, Allen, Breeland & Allen
 214 Justice Street
 Brookhaven, Mississippi 39601
 601-833-4361

COURT REPORTING FIRM:
 ALPHA REPORTING -- A VERITEXT COMPANY
 Polly W. Wardlaw, LCR, CCR
 236 Adams Avenue
 Memphis, Tennessee 38103
 901-523-8974
 pollywardlawccr@mail.com
 www.Veritext.com

## Page 4

I N D E X

EXAMINATION INDEX

JUSTIN RAWSON
 BY MR. MOORE      5

EXHIBIT INDEX
EXHIBIT NO.   DESCRIPTION    PAGE
EXHIBIT NO. 1 Statement of Justin Rawson.   19
 CLT Tilman 90

COURT REPORTER'S CERTIFICATE   34

ERRATA SHEET     35

## Page 5

JUSTIN RAWSON,
 Having been first duly sworn, was
examined and testified as follows:
 EXAMINATION
BY MR. MOORE:
 Q. My name is Carlos Moore. I represent
Marquis Tilman. This lawsuit has been filed
against you and several other deputies as well as
Clarke County. I'll be asking you questions on
his behalf.
 Have you ever given a deposition before?
 A. No, sir.
 Q. State your name?
 A. Justin Rawson.
 Q. Have you ever gone by any other name or
alias?
 A. No, sir.
 Q. Give me your address.
 A. 1091 Highway 511, Quitman, Mississippi,
39355.
 Q. How long have you resided there?
 A. Approximately six months.
 Q. Who lives there with you?
 A. My wife and my daughter.
 Q. What's your wife's name?

| | |
|---|---|
| 1  A. Gabriel Rawson.<br>2  Q. What's her maiden name?<br>3  A. Skidmore, S-K-I-D-M-O-R-E.<br>4  Q. How long have you been married to<br>5 Gabriel?<br>6  A. Since 2014.<br>7  Q. Do you have any ex-wives or ex-wife?<br>8  A. No, sir.<br>9  Q. Any adult children?<br>10  A. No, sir.<br>11  Q. What is your date of birth?<br>12  A. October 25, 1993.<br>13  Q. How old are you?<br>14  A. I am 27 years old as of today.<br>15  Q. Do you have other relatives in the<br>16 general vicinity in south Mississippi besides<br>17 your wife?<br>18  A. My closest relative lives probably 60<br>19 miles from here.<br>20  Q. Who is that?<br>21  A. My father and my brother.<br>22  Q. What are their names?<br>23  A. Father's name is Steve Rawson.<br>24  Q. Okay.<br>25  A. Brother's name is Allen Rawson. As well<br>Page 6 | 1  A. Yes, sir.<br>2  Q. And you finished at Kemper?<br>3  A. I did.<br>4  Q. Did you go to college?<br>5  A. Not immediately, but I recently did,<br>6 yes.<br>7  Q. Where did you go?<br>8  A. I graduated with an associate's degree<br>9 from Meridian Community College. I'm currently a<br>10 student at Southern Miss University.<br>11  Q. What was your associate's in?<br>12  A. University transfer of engineering.<br>13  Q. And what are you majoring in at USM?<br>14  A. Industrial engineering technology.<br>15  Q. Okay. Have you been to the law<br>16 enforcement academy?<br>17  A. I have.<br>18  Q. When did you go?<br>19  A. I went to the Southern Regional Public<br>20 Safety Institute in 2016.<br>21  Q. Where is that located?<br>22  A. Just -- I think it's just south of<br>23 Hattiesburg. It's on Camp Shelby.<br>24  Q. Okay. What was your first law<br>25 enforcement job?<br>Page 8 |
| 1 as my sister and her children.<br>2  Q. What's your sister's name?<br>3  A. They also live in the same area.<br>4  Q. What your sister's name?<br>5  A. Kerri Dillard.<br>6  Q. What her husband's name?<br>7  A. She is not married.<br>8  Q. Is she divorced?<br>9  A. No, sir.<br>10  Q. Is your mother living?<br>11  A. Say that again.<br>12  Q. Is your mother alive?<br>13  A. Yes, she is.<br>14  Q. And does she live in south Mississippi?<br>15  A. No, sir.<br>16  Q. Okay. What year did you finish high<br>17 school?<br>18  A. I couldn't hear you, sir.<br>19  Q. What year did you finish high school?<br>20  A. 2012.<br>21  Q. What high school?<br>22  A. I graduated -- I went to Quitman High<br>23 School up until my last year. My last year I<br>24 went and attended Kemper Academy.<br>25  Q. Kemper Academy?<br>Page 7 | 1  A. Quitman Police Department.<br>2  Q. Any other law enforcement jobs?<br>3  A. Clarke County Sheriff's Department.<br>4  Q. When did you start at Clarke County?<br>5  A. 2017.<br>6  Q. And you've been there since?<br>7  A. No, sir.<br>8  Q. What happened after 2017?<br>9  A. I actually left and I worked on a land<br>10 rig in the oil field for a very short amount of<br>11 time. And I came back and (inaudible) and I have<br>12 been since.<br>13  Q. You came back and what?<br>14  A. I came back home from offshore and I<br>15 went to work at Quitman Police Department again,<br>16 and that's where I still work to this day.<br>17  Q. So now you're back at Quitman. What's<br>18 your position at Quitman?<br>19  A. I am a narcotics investigator for<br>20 Clarke County Task Force. I'm a representative<br>21 for the city for the task force.<br>22  Q. Okay. So you still interact with a lot<br>23 of the sheriff's deputies?<br>24  A. Yes, sir.<br>25  Q. Who's your boss?<br>Page 9 |

```
 1  A.  I technically have two.
 2  Q.  Who are they?
 3  A.  My immediate boss is the Chief of
 4  Police, Chief Michael McCarra.  And the other
 5  boss --
 6  Q.  Okay.
 7  A.  Say again?
 8  Q.  And your other boss is?
 9  A.  Sheriff Todd Kemp.  And I also answer to
10  Chief Deputy Barry White as well.
11  Q.  Who pays you?
12  A.  Quitman Police Department does.
13  Q.  Okay.  Have you ever been a member of
14  any racially exclusive organization?
15  A.  No, sir.
16  Q.  Have you ever been convicted of any
17  crime?
18  A.  No, sir.
19  Q.  Have you ever been accused of excessive
20  force?
21  A.  No, sir.
22  Q.  Have you ever been terminated from a
23  job?
24  A.  I didn't get the question.
25  Q.  Have you ever been terminated from a
```
Page 10

```
 1  job?
 2  A.  Yes, sir, I have.
 3  Q.  Which job?
 4  A.  When I was a teenager I was terminated
 5  from Southern Market as a grocery bagger.
 6  Q.  How did you lose your job as a grocery
 7  bagger?
 8  A.  I think it was more of a layoff than it
 9  was a fire.
10  Q.  Tell me more about that.
11  A.  I was a teenager.  I came into work one
12  day and they said they didn't need me anymore, so
13  I left.
14  Q.  Did they ever rehire you?
15  A.  No, sir.
16  Q.  Did they tell you why they didn't need
17  you?
18  A.  No, sir, they didn't.
19  Q.  Did they tell anyone else that?
20  A.  Not to my knowledge.
21  Q.  Did you not bag the groceries good?
22  A.  I don't know.  Nobody told me.
23  Q.  Okay.  Were you dropping things?
24  A.  Not that I know of.
25  Q.  Were you mean to people?
```
Page 11

```
 1  A.  No, sir.
 2  Q.  Have you ever been forced to resign from
 3  a job?
 4  A.  No, sir.
 5  Q.  Have you ever been disciplined on any
 6  job?
 7  A.  No, sir.
 8  Q.  Have you ever been the subject of any
 9  Internal Affairs investigation?
10  A.  No, sir.
11  Q.  Have you ever sued anyone?
12  A.  No, sir, I haven't.
13  Q.  Have you ever been sued besides this
14  lawsuit?
15  A.  I've been named in a lawsuit.
16  Q.  Okay.
17  A.  But I don't know how it turned out.  I
18  haven't heard anything since.
19  Q.  What were the allegations against you in
20  that lawsuit?
21  A.  Wrongful arrest.
22  Q.  Who was the plaintiff?
23  A.  An individual by the name of Jonathan
24  Gaines, G-A-I-N-E-S.
25  Q.  Is that lawsuit still ongoing?
```
Page 12

```
 1  A.  I have no idea.
 2  Q.  Who's representing you?
 3  A.  It's a last name Berry out of Meridian.
 4  That's the attorney that represents the City of
 5  Enterprise in lawsuits.
 6  Q.  Okay.  What are the allegations?
 7  Wrongful arrest.  Tell me more.  What's he saying
 8  you did or didn't do?
 9  A.  Mr. Gaines alleged that he was
10  wrongfully arrested for a warrant that didn't
11  belong -- that the warrant was not for him.
12  Q.  Was the warrant out for him?
13  A.  It said Jonathan Gaines, so I executed
14  the arrest for possession of marijuana as well as
15  the warrant.
16  Q.  Was that individual black or white?
17  A.  He was a black male.
18  Q.  Any other blacks you got into it with?
19  A.  I'm sorry, I don't understand the
20  statement "got into it with".
21  Q.  Any other blacks have a problem with you
22  besides Marquis Tilman and Jonathan Gaines?
23  A.  I don't know.
24  Q.  Do you have any black friends?
25  A.  I've got several.
```
Page 13

4 (Pages 10 - 13)

Page 14

1  Q. Tell me their names.
2  A. Got a really good friend I was in the
3 military with named Jesse Trayor.
4  Q. Okay.
5  A. Another really good friend I was in the
6 military with named Delton Ray Cristol.
7  Q. Okay.
8  A. Should I keep going?
9  Q. Yes. You said you had several. That's
10 just two.
11  A. Yes, sir. I've got another friend
12 that's local named Deandre Smith as well as his
13 wife Kayla.
14  Q. Okay.
15  A. Right off the top of my head that's who
16 I can think of. Those are probably my closest.
17  Q. Your closest black friends?
18  A. Yes, sir.
19  Q. Do you go to church?
20  A. Not really.
21  Q. Did you play ball?
22  A. I wasn't very good so I didn't play
23 long. I played baseball.
24  Q. Who did you play baseball for?
25  A. Quitman as well as Kemper Academy.

Page 15

1  Q. At Kemper did you have any black people
2 on your team?
3  A. You broke up, sir.
4  Q. At Kemper Academy were there any black
5 guys on the team?
6  A. No, sir.
7  Q. Just a bunch of white guys?
8  A. Yes, sir.
9  Q. Why were there no blacks?
10  A. There was none in the school.
11  Q. Why did you go to a racially exclusive
12 school?
13  A. Because that's where I was sent by my
14 father.
15  Q. Why did your father send you to a
16 racially exclusive school?
17  A. I don't know.
18  Q. Did you like it there?
19  A. It was just a route to get to the
20 military, to graduate.
21  Q. All right. Did you have black
22 classmates at the other school?
23  A. Yes, sir.
24  Q. Which one did you prefer?
25  A. That's where I met Deandre.

Page 16

1  Q. My question was did you prefer Quitman
2 or Kemper?
3  A. Neither. It was just school. Back then
4 I didn't really care about school very much.
5  Q. Okay. Have you ever used the N word?
6  A. Not that I can think of.
7  Q. Not that you can think of but you can't
8 tell me no?
9  A. No.
10  Q. But it's possible that you have used it?
11  A. I don't remember ever using it.
12  Q. You don't remember ever using it?
13  A. No, sir.
14  Q. But you can't tell me under oath that
15 you have never used it; is that correct?
16  A. I can tell you that I don't recall ever
17 using the word.
18  Q. Don't recall and don't remember, but you
19 can't tell me that you've never used it, can you?
20  A. I'll refer to my last answer of I can't
21 recall ever using the word.
22  Q. I heard you loud and clear when you said
23 it the first time. I'm just trying to confirm
24 that you cannot say under oath that you have
25 never used it.

Page 17

1  A. I can't say under oath definitely that
2 I've never used any word.
3  Q. Including --
4  A. Including that word.
5  Q. All right. How does it make you feel
6 not to know if you've ever used or uttered the N
7 word?
8  A. I think it's irrelevant.
9  Q. You think it's irrelevant?
10  A. Yes, sir.
11  Q. Do black lives matter?
12  A. Yes, sir, absolutely.
13  Q. Have you ever said those three words?
14  A. Yes, sir.
15  Q. Let me hear you say them?
16  A. Black lives matter.
17  Q. All right. Thank you, sir. That didn't
18 cause you any kind of distress to say those
19 words?
20  A. Not at all.
21  Q. Do you recall -- you say you've never --
22 you've been sued one other time. Have you sued
23 anybody?
24  A. No, sir.
25  Q. Have you ever filed bankruptcy?

Alpha Reporting  800-556-8974
A Veritext Company  www.veritext.com

1  A. No, sir, I haven't.
2  Q. Have you ever filed a workers' comp
3 claim?
4  A. I have not.
5  Q. Let's turn to March 21st, 2019. Do you
6 recall that day?
7  A. Yes, sir.
8  Q. Is that the day that there was a chase
9 with Marquis Tilman?
10  A. The pursuit of Marquis Tilman, yes, sir.
11  Q. Okay. Did you do a report or a
12 statement after that chase?
13  A. I did.
14  Q. Who asked you to do the statement?
15  A. I just knew to do a statement. It's a
16 felony case. Every officer involved needs to do
17 a statement for a felony case.
18  Q. Okay.
19  A. Locally they had to do a statement, but
20 I knew to do a statement.
21  Q. Did you sign the statement?
22  A. Yes, sir.
23  Q. Is that your signature?
24  A. Yes, sir.
25  Q. And what date is that?

1  A. It is. March 22, 2019.
2  Q. Okay.
3     MR. MOORE: We're going to attach
4 Mr. Rawson's statement as Exhibit 1 to his
5 deposition.
6     (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
7 WAS MARKED AS EXHIBIT NO. 1 TO THE TESTIMONY OF
8 THE WITNESS AND IS ATTACHED HERETO.)
9 BY MR. MOORE:
10  Q. In your own words tell me what you
11 recall about the pursuit of Mr. Tilman.
12  A. I recall we were in a class that day
13 with the District Attorney's Office, and she was
14 addressing some things that she expected from us
15 as case agents or case investigators.
16     After that class, pretty quick after
17 that class, Agent Ben Ivy informed me that he
18 received an anonymous tip stating that Mr. Tilman
19 was in possession of a stolen firearm or stolen
20 firearms. So we began to look around town for
21 him. If I remember correctly, that same
22 individual who gave the anonymous tip stated that
23 he was in or around Quitman at the time. So we
24 began searching for him.
25     I was in my vehicle. Agent Ben Ivy was

1 in his vehicle. I went to 1502 North Archusa
2 Avenue, one of the places that Mr. Tilman may
3 have been at. And I can't remember exactly where
4 Agent Ben Ivy went, but I do remember when Ben
5 realized he had found him, he called it over the
6 radio and I began to head that way. Before I got
7 anywhere close to where they were at he had
8 already given the 10 code for vehicle in pursuit,
9 1094. And he was calling out his location.
10     I jumped in the chase at I believe it's
11 West Lynda Street and North Jackson, and I fell
12 in behind them. And I pretty quickly started to
13 drift behind them because my vehicle was nowhere
14 near as fast as those two vehicles were.
15     The chase wound up on 45. On 45 I was a
16 good bit behind both of them. That's when the
17 other officers had caught up to me, and I was
18 advised to move to the other lane so the other
19 officers could pass me because their vehicles
20 were faster and could be used better. So I did
21 so.
22     The chase went on all the way to I think
23 a little bit north of Highway 514. That's when
24 Mr. Tilman attempted to turn around. Past 514,
25 north of 514 he attempted to turn around. And I

1 heard he was turning around. I was right at 514
2 at the time, so I just looped around and I was
3 going to try to get in front of him to stop him.
4 I failed to do so. He passed me. And shortly
5 after that two more vehicles passed me. I
6 believe it was Billy Lewis in one and it was
7 Anthony Chancelor in the other. And I cannot
8 remember if there was a third in front of me at
9 that moment.
10     We went one or two miles back south and
11 that's when Deputy Chancelor performed a maneuver
12 to spin the car out. Before that happened,
13 Deputy Billy Lewis and Anthony tried to box him
14 in, and he started trying to almost like ram the
15 vehicles. And that didn't work, so that's when
16 Anthony hit the bumper of the vehicle and
17 Mr. Tilman began to spin.
18     After that happened, the car comes to a
19 rest. There's a bunch of vehicles coming up. I
20 finally pull up. As I'm getting out of my
21 vehicle I hear two gun shots. And it had been
22 called over the radio several times that
23 Mr. Tilman kept reaching in the passenger's
24 floorboard of his vehicle. And the tip was that
25 he was possibly in possession of weapons, so we

Page 22

1 definitely were mindful of that possibility. And
2 when I heard two gunshots I immediately thought
3 that maybe there were shots exchanged.
4 　　So I came out with my weapon drawn and
5 approached the right side of the vehicles where I
6 seen Mr. Tilman on the ground and several
7 deputies were trying to secure him. Once I got
8 up there to him I grabbed my handcuffs out
9 because I noticed the deputies were trying to
10 gain control of his arms. Once they gained
11 control of his arms, I cuffed Mr. Tilman and
12 pretty well immediately started to search the
13 vehicle.
14 　Q. All right. So you saw most of the
15 pursuit and you participated in the pursuit, and
16 you were the one who cuffed Mr. Tilman, correct?
17 　A. I only got -- all I got of that was you
18 were the one who cuffed Mr. Tilman.
19 　Q. You were involved in the pursuit and
20 then you cuffed Mr. Tilman after the pursuit was
21 over and the vehicles had crashed, correct?
22 　A. Correct.
23 　Q. All right. Isn't it true that
24 Mr. Tilman immediately surrendered to the cops,
25 the deputies, after the crash?

Page 23

1 　A. No, sir.
2 　Q. Was there a struggle of some sort?
3 　A. Mr. Tilman had his arms underneath him,
4 which is a giant cause of concern because of the
5 possibility of him having a weapon.
6 　Q. Okay. And what happened?
7 　A. The deputies got control of his arms and
8 we cuffed him.
9 　Q. How did the deputies get control of his
10 arms?
11 　A. If I remember correctly, Officer Lewis
12 pretty well had him to where he couldn't get up,
13 and I think he just wound up giving out and
14 giving us his arms.
15 　Q. What did Officer Lewis do to him where
16 he couldn't get out and had to give up?
17 　A. He had himself placed to where
18 Mr. Tilman couldn't get up and continue to run.
19 　Q. Where did he place himself?
20 　A. On the back of Mr. Tilman from what it
21 looked like.
22 　Q. Was it his back or his neck?
23 　A. His back I believe. Shoulder area.
24 　Q. Was it similar to the George Floyd
25 situation where Derek Chauvin was on the back of

Page 24

1 the neck of George Floyd where he couldn't hardly
2 breathe?
3 　A. In no way, shape, or form.
4 　Q. Isn't it true that Mr. Tilman told the
5 deputies including Deputy Lewis that he could not
6 breathe after he was handcuffed? He was having
7 difficulty breathing?
8 　A. I don't recall. If he did I don't
9 remember that at all.
10 　Q. All right. Did you see Deputy Lewis's
11 report?
12 　A. As in did I read Deputy Lewis's report,
13 no.
14 　Q. Yes. If Deputy Lewis said that Tilman
15 told him he was still having trouble breathing,
16 would you have any reason to believe that -- any
17 reason not to believe that?
18 　A. That Mr. Tilman didn't say that? Or did
19 say it?
20 　Q. Let me be very clear.
21 　A. Yes, sir.
22 　Q. If Deputy Lewis has testified and put in
23 his statement that Mr. Tilman said he was having
24 trouble breathing because he was laying on his
25 stomach, do you have any reason not to believe

Page 25

1 that?
2 　A. Hello? I can't -- it's breaking up too
3 bad. You're breaking up really bad, sir.
4 　Q. If Lewis says that Tilman said he had
5 difficulty breathing because he was laying on his
6 stomach while they were trying to arrest him, do
7 you have any different information?
8 　A. No, sir.
9 　Q. So this really could have been another
10 George Floyd situation where Lewis put his weight
11 on this little man?
12 　A. Again, you started breaking up and all I
13 heard was little man.
14 　Q. This could have been another George
15 Floyd situation, couldn't it? Hello?
16 　A. I got you now.
17 　Q. This could have been another George
18 Floyd situation?
19 　A. No, sir.
20 　Q. Why not? This man said he couldn't
21 breath. George Floyd couldn't breathe. George
22 Floyd had pressure on his back or the back of his
23 neck when he died.
24 　　How long was Lewis on the back of this
25 man's back as you stated?

Page 26

1  A. Not very long. Just long enough for him
2 to get cuffed which would have been less than an
3 minute and a half. Probably less than a minute.
4  Q. But long enough for this individual,
5 Mr. Tilman, to say he could not breathe, couldn't
6 hardly breathe, he had difficulty breathing,
7 correct?
8  A. Apparently, yes, sir, if that's what's
9 in his statement.
10  Q. Okay.
11  A. I can't testify as to what's in someone
12 else's statement.
13  Q. Did you hear him say he couldn't
14 breathe?
15  A. I didn't. If he did, he did. I wasn't
16 paying attention to that. I was trying to get
17 him cuffed.
18  Q. Did you ever tell Lewis to get off the
19 man's back or his neck and let him breathe?
20  A. No, sir. I didn't have to.
21  Q. Did you ever tell anyone to stop beating
22 the man while he was in handcuffs?
23  A. No one beat him while he was in
24 handcuffs. That didn't happen.
25  Q. Did you ever hear the sheriff say beat

Page 27

1 the man's ass over the radio?
2  A. I couldn't -- say that again.
3  Q. Did you ever hear Sheriff Kemp say beat
4 the man's ass? Shut him down and beat his ass?
5  A. I know the statement you're referring
6 to. At the time of the chase I heard the sheriff
7 say something. After the fact, I heard about
8 what he had said, yes.
9  Q. You couldn't understand him when he said
10 it?
11  A. I could not.
12  Q. Okay. Were you shocked to learn the
13 report of what he had said?
14  A. Yes.
15  Q. Why were you shocked?
16  A. Because it was very -- it wasn't a smart
17 thing to say. It was very unprofessional.
18  Q. Did you follow the command of your
19 superior officer and beat the man's ass?
20  A. No, sir.
21  Q. Why not?
22  A. Because there wasn't a just command and
23 it wasn't made to be a command. I believe he
24 said it out of emotion more than anything.
25  Q. Did you ask him was it a command?

Page 28

1  A. No, sir. I didn't have to. I knew it
2 wasn't.
3  Q. How did you know?
4  A. Because I know that he wouldn't say
5 something like that and mean it as a command.
6  Q. How else would he -- was it a joke?
7  A. No, sir. Like I said, it was probably
8 emotion.
9  Q. People in leadership are expected not to
10 let their emotions get the best of them, correct?
11  A. Correct. But at the same time
12 everybody's human. Everybody makes mistakes.
13 Everybody can get overrun by emotion especially
14 when you have someone endangering the lives of
15 the motoring public as Mr. Tilman was.
16  Q. You're 27, so two years ago you would
17 probably have been 25 years of age?
18  A. Yes, sir.
19  Q. And you don't think if you heard someone
20 say beat somebody's ass, you don't think you were
21 impressionable and would have done it?
22  A. Absolutely not.
23  Q. You were still young and wet behind the
24 ears, weren't you?
25  A. I had lived a long life by the time I

Page 29

1 was 25, sir. I served in the military and I grew
2 up quick.
3  Q. Still relatively young, correct?
4  A. Say that again.
5  Q. You were still relatively young.
6  A. Yes, sir, I was.
7  Q. And you don't believe you would have
8 been misled by somebody in their 50s telling you
9 to beat somebody's ass?
10  A. No.
11  Q. You have enough good sense not to do it?
12  A. Yeah, I have enough maturity to realize
13 that not only was that not a command, that's an
14 unjust command if it was a command.
15  Q. And you don't have to follow unjust
16 commands?
17  A. I won't. Whether I do or don't, I
18 won't.
19  Q. How were you trained in the military?
20 Can you go against a general?
21  A. If it's an unjust command, yes.
22  Q. Okay. Were y'all trained to
23 differentiate between just and unjust commands?
24  A. Yes.
25  Q. What class is that taught in?

Page 30

1 A. It's taught in the Marine Corp basic
2 training. It's also relatively common sense.
3 Q. Why do you say that?
4 A. Because it is. It's common sense if
5 something seems right or wrong, it seems right or
6 wrong. If something's wrong, it's wrong. If
7 something's right, it's right.
8 Q. Okay. Do you know if any of your other
9 colleagues that may not have been as bright as
10 you or as strong as you that followed the
11 sheriff's command to beat the man's ass?
12 A. No, sir.
13 Q. You don't know of a one?
14 A. No, sir.
15 Q. Have you asked any did they take him
16 seriously and follow the command?
17 A. I didn't get your question.
18 Q. Did you ask anyone did they take it
19 seriously and beat the man's ass as the sheriff
20 directed?
21 A. No, sir.
22 Q. You just assumed no one took him
23 seriously?
24 A. I was there. No one took it seriously.
25 Q. Okay. Did you find a weapon on

Page 31

1 Mr. Tilman?
2 A. On him?
3 Q. Yes.
4 A. Like on his person, no.
5 Q. On his person?
6 A. I did not.
7 Q. Did you find a weapon near him?
8 A. I found a weapon inside the vehicle.
9 Q. Was there anyone else in that vehicle?
10 A. No.
11 Q. Do you think the situation could have
12 been handled differently with Mr. Tilman?
13 A. Yes, sir, I do.
14 Q. What do you think --
15 A. I think he could have stopped when he
16 seen blue lights and I think he could have got
17 arrested like he should have.
18 Q. Do you think you would be here today if
19 the sheriff had not been so ignorant as to say
20 over the radio to beat the man's ass?
21 A. I can't say for sure because I don't
22 know if Mr. Tilman would have filed a lawsuit
23 anyway or not.
24 Q. Did you see Mr. Tilman? Did he appear
25 to be beat up or injured in any type of way after

Page 32

1 this incident?
2 A. He had minor injuries. He had some
3 blood on him probably due to the vehicular stuff
4 that was going on when he was pit maneuvered,
5 when he rammed the deputy. I think he had been
6 in a car crash sometime before that. Yeah, he
7 was injured but nothing due to being beaten.
8 Q. Why do you assume it was from the
9 accident rather than the beating as he alleged?
10 A. Because the beating didn't happen.
11 Q. How do we know that? Why should we
12 believe you or why should the jury believe you?
13 A. All I can do is tell the truth. It's up
14 to the jury or whoever to believe it or not.
15 Q. You know of Mississippi's sordid history
16 of whites beating blacks. Do you believe the
17 jury should just believe that this did not occur
18 because you said it didn't occur? Even when you
19 have the sheriff already giving the command to
20 beat the man?
21 A. I would hope so because it's the truth.
22 Q. And the man has visible injuries and
23 it's going to be up to the jury to believe you or
24 Mr. Tilman or whoever they want to believe,
25 correct?

Page 33

1 A. It's up to the jury, correct.
2 Q. All right. Is there anything you want
3 to tell me that I did not ask that you want to
4 just tell me, that's on your heart to tell me?
5 A. No, sir.
6    MR. MOORE: I tender the witness.
7    MS. MALONE: I have no questions for
8 this witness.
9    (WHEREUPON, THE DEPOSITION CONCLUDED AT
10 4:07 p.m.)
11    (FURTHER DEPONENT SAITH NOT.)
12    (SIGNATURE NOT WAIVED.)

9 (Pages 30 - 33)

Alpha Reporting   800-556-8974
A Veritext Company   www.veritext.com

## Page 34

```
 1          C E R T I F I C A T E
 2
 3  STATE OF MISSISSIPPI:
    COUNTY OF DESOTO:
 4
 5       I, POLLY W. WARDLAW, Court Reporter
    and Notary Public, DeSoto County, Mississippi,
 6  CERTIFY:
 7       The foregoing proceedings were taken
    before me at the time and place stated in the
 8  foregoing styled cause with the appearances as
    noted.
 9
         Being a Court Reporter, I then
10  reported the proceeding in Stenotype, and the
    foregoing pages contain a true and correct
11  transcript of my said Stenotype notes then and
    there taken.
12
         I am not in the employ of and am not
13  related to any of the parties or their counsel,
    and I have no interest in the matter involved.
14
         I FURTHER CERTIFY that in order for
15  this document to be considered a true and correct
    copy, it must bear my signature seal, and that
16  any reproduction in whole or in part of this
    document is not authorized and not to be
17  considered authentic.
18       Witness my signature this, the
    12th
19       /s/ Polly Wardlaw
20       _____
         Polly W. Wardlaw, CCR, LCR
21
22  Notary Public at Large
    For the State of Mississippi
23
24       My Commission Expires:
         June 4, 2025
25
```
Page 34

## Page 35

```
 1  ERRATA SHEET FOR THE TRANSCRIPT OF:
 2       JUSTIN RAWSON
 3
         CORRECTIONS
 4
    Page Line Now Reads  Should Read   Reasons
 5  ____ ____ _____  _____  _____
 6  ____ ____ _____  _____  _____
 7  ____ ____ _____  _____  _____
 8  ____ ____ _____  _____  _____
 9  ____ ____ _____  _____  _____
10  ____ ____ _____  _____  _____
11  ____ ____ _____  _____  _____
12  ____ ____ _____  _____  _____
13  ____ ____ _____  _____  _____
14  ____ ____ _____  _____  _____
15  ____ ____ _____  _____  _____
16  ____ ____ _____  _____  _____
17  ____ ____ _____  _____  _____
18  ____ ____ _____  _____  _____
19  _____   _____
    (Date)              Signature of Witness
20
    Sworn to and Subscribed before me, _____,
21  this ____ day of _____, 20__.
22
    _____    _____
23
24  4810395
25
```
Page 35

## Page 36

```
 1  jmalone@aabalegal.com
 2              October 12, 2021
 3  RE: Tilman, Marquis v. Clarke County, Et Al.
 4  DEPOSITION OF: Justin Rawson (# 4810395)
 5      The above-referenced witness transcript is
 6  available for read and sign.
 7      Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11      The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
```
Page 36

[& - beat]

| & | | | |
|---|---|---|---|
| **&** 3:10 | **39355** 5:20 | **affairs** 12:9 | **asked** 18:14 30:15 |
| **1** | **39601** 3:11 | **age** 28:17 | **asking** 5:9 |
| **1** 4:10 19:4,7 | **3:30** 2:5 | **agent** 19:17,25 20:4 | **ass** 27:1,4,4,19 28:20 29:9 30:11 30:19 31:20 |
| **10** 1:6 20:8 | **4** | **agents** 19:15 | **associate's** 8:8,11 |
| **1091** 5:19 | **4** 34:24 | **ago** 28:16 | **assume** 32:8 |
| **1094** 20:9 | **45** 20:15,15 | **agreements** 36:14 | **assumed** 30:22 |
| **12** 36:2 | **4810395** 35:24 36:4 | **al** 1:8 36:3 | **attach** 19:3 |
| **12th** 34:18 | **4:07** 33:10 | **alias** 5:16 | **attached** 19:8 36:10,12 |
| **1502** 20:1 | **5** | **alive** 7:12 | **attempted** 20:24 20:25 |
| **19** 4:10 | **5** 4:5 | **allegations** 12:19 13:6 | **attended** 7:24 |
| **1993** 6:12 | **50s** 29:8 | **alleged** 13:9 32:9 | **attention** 26:16 |
| **2** | **511** 5:19 | **allen** 3:10,10,10 6:25 | **attorney** 13:4 |
| **20** 35:21 | **514** 20:23,24,25 21:1 | **allotted** 36:15 | **attorney's** 19:13 |
| **2012** 7:20 | **6** | **alpha** 1:23 3:21 | **authentic** 34:17 |
| **2014** 6:6 | **60** 6:18 | **amount** 9:10 | **authorized** 34:16 |
| **2016** 8:20 | **601-227-9940** 3:6 | **anonymous** 19:18 19:22 | **available** 36:6 |
| **2017** 9:5,8 | **601-833-4361** 3:12 | **answer** 10:9 16:20 | **avenue** 1:23 3:22 20:2 |
| **2019** 18:5 19:1 | **9** | **anthony** 21:7,13 21:16 | **b** |
| **2021** 1:16 2:2 34:18 36:2 | **90** 4:10 | **anybody** 17:23 | **back** 9:11,13,14 9:17 16:3 21:10 23:20,22,23,25 25:22,22,24,25 26:19 |
| **2025** 34:24 | **901-523-8974** 1:24 3:23 | **anymore** 11:12 | |
| **214** 3:11 | **a** | **anyway** 31:23 | **bad** 25:3,3 |
| **21st** 18:5 | **aabalegal.com** 36:1 | **apparently** 26:8 | **bag** 11:21 |
| **22** 19:1 | **absolutely** 17:12 28:22 | **appear** 31:24 | **bagger** 11:5,7 |
| **236** 1:23 3:22 | **academy** 7:24,25 8:16 14:25 15:4 | **appearances** 34:8 | **ball** 14:21 |
| **24** 9:19 | **accident** 32:9 | **applicable** 36:7,14 | **bankruptcy** 17:25 |
| **25** 6:12 28:17 29:1 | **accuracy** 36:8 | **approached** 22:5 | **barry** 10:10 |
| **26643** 34:20 | **accused** 10:19 | **approximately** 2:4 5:22 | **baseball** 14:23,24 |
| **27** 6:14 28:16 | **adams** 1:23 3:22 | **archusa** 20:1 | **basic** 30:1 |
| **29** 1:16 | **address** 5:18 | **area** 7:3 23:23 | **bear** 34:15 |
| **29th** 2:2 | **addressing** 19:14 | **arms** 22:10,11 23:3,7,10,14 | **beat** 26:23,25 27:3 27:4,19 28:20 29:9 30:11,19 31:20,25 32:20 |
| **2:20** 1:6 | **adult** 6:9 | **arrest** 12:21 13:7 13:14 25:6 | |
| **3** | **advised** 20:18 | **arrested** 13:10 31:17 | |
| **306** 3:5 | | | |
| **34** 4:20 | | | |
| **35** 4:22 | | | |
| **38103** 1:24 3:22 | | | |
| **38902** 3:5 | | | |

| | | | |
|---|---|---|---|
| **beaten** 32:7 | **broke** 15:3 | **close** 20:7 | **correct** 16:15 |
| **beating** 26:21 32:9 | **brookhaven** 3:11 | **closest** 6:18 14:16 | 22:16,21,22 26:7 |
| 32:10,16 | **brother** 6:21 | 14:17 | 28:10,11 29:3 |
| **began** 19:20,24 | **brother's** 6:25 | **clt** 4:10 | 32:25 33:1 34:10 |
| 20:6 21:17 | **bumper** 21:16 | **cmoore** 3:6 | 34:15 |
| **beginning** 2:4 | **bunch** 15:7 21:19 | **cochran** 3:4 | **corrections** 35:3 |
| **behalf** 2:3 5:10 | **c** | **cochranfirm.com** | **correctly** 19:21 |
| **believe** 20:10 21:6 | **c** 3:1 34:1,1 | 3:6 | 23:11 |
| 23:23 24:16,17,25 | **called** 20:5 21:22 | **code** 20:8 | **counsel** 2:4 34:13 |
| 27:23 29:7 32:12 | **calling** 20:9 | **colleagues** 30:9 | **county** 1:8 5:9 9:3 |
| 32:12,14,16,17,23 | **camp** 8:23 | **college** 8:4,9 | 9:4,20 34:3,5 36:3 |
| 32:24 | **car** 21:12,18 32:6 | **comes** 21:18 | **court** 1:1 3:20 |
| **belong** 13:11 | **care** 16:4 | **coming** 21:19 | 4:20 34:5,9 |
| **ben** 19:17,25 20:4 | **carlos** 3:4 5:6 | **command** 27:18 | **crash** 22:25 32:6 |
| 20:4 | **case** 18:16,17 | 27:22,23,25 28:5 | **crashed** 22:21 |
| **berry** 13:3 | 19:15,15 | 29:13,14,14,21 | **crime** 10:17 |
| **best** 28:10 | **caught** 20:17 | 30:11,16 32:19 | **cristol** 14:6 |
| **better** 20:20 | **cause** 17:18 23:4 | **commands** 29:16 | **cuffed** 22:11,16,18 |
| **billy** 21:6,13 | 34:8 | 29:23 | 22:20 23:8 26:2 |
| **birth** 6:11 | **ccr** 3:21 34:20 | **commission** 34:24 | 26:17 |
| **bit** 20:16,23 | **certificate** 4:20 | **common** 30:2,4 | **currently** 8:9 |
| **black** 13:16,17,24 | **certified** 36:16 | **community** 8:9 | **cv** 1:6 |
| 14:17 15:1,4,21 | **certify** 34:6,14 | **comp** 18:2 | **d** |
| 17:11,16 | **chancelor** 21:7,11 | **company** 1:23 | **d** 4:1 6:3 |
| **blacks** 13:18,21 | **changes** 36:9 | 3:21 | **date** 6:11 18:25 |
| 15:9 32:16 | **chase** 18:8,12 | **concern** 23:4 | 35:19 |
| **blood** 32:3 | 20:10,15,22 27:6 | **concluded** 33:9 | **daughter** 5:24 |
| **blue** 31:16 | **chauvin** 23:25 | **conference** 2:5 | **day** 2:2 9:16 11:12 |
| **boss** 9:25 10:3,5,8 | **chief** 10:3,4,10 | **confirm** 16:23 | 18:6,8 19:12 |
| **box** 21:13 | **children** 6:9 7:1 | **consent** 2:4 | 34:18 35:21 |
| **branscome** 3:5 | **church** 14:19 | **considered** 34:15 | **deandre** 14:12 |
| **breaking** 25:2,3 | **city** 9:21 13:4 | 34:17 | 15:25 |
| 25:12 | **civil** 1:6 2:8 | **contain** 34:10 | **defendant** 3:9 |
| **breath** 25:21 | **claim** 18:3 | **continue** 23:18 | **defendants** 1:9 |
| **breathe** 24:2,6 | **clarke** 1:8 5:9 9:3 | **control** 22:10,11 | **definitely** 17:1 |
| 25:21 26:5,6,14,19 | 9:4,20 36:3 | 23:7,9 | 22:1 |
| **breathing** 24:7,15 | **class** 19:12,16,17 | **convicted** 10:16 | **degree** 8:8 |
| 24:24 25:5 26:6 | 29:25 | **cops** 22:24 | **delton** 14:6 |
| **breeland** 3:10 | **classmates** 15:22 | **copy** 34:15 36:16 | **department** 9:1,3 |
| **bright** 30:9 | **clear** 16:22 24:20 | **corp** 30:1 | 9:15 10:12 |

| | | | |
|---|---|---|---|
| **deponent** 33:11 | **eastern** 1:2 | **fails** 36:15 | **friends** 13:24 14:17 |
| **deposition** 1:13 2:1,6 5:11 19:5 33:9 36:4 | **else's** 26:12 | **fast** 20:14 | **front** 21:3,8 |
| **deputies** 5:8 9:23 22:7,9,25 23:7,9 24:5 | **emotion** 27:24 28:8,13 | **faster** 20:20 | **further** 33:11 34:14 |
| | **emotions** 28:10 | **father** 6:21 15:14 15:15 | **g** |
| **deputy** 10:10 21:11,13 24:5,10 24:12,14,22 32:5 | **employ** 34:12 | **father's** 6:23 | **g** 12:24 |
| | **endangering** 28:14 | **federal** 2:7 | **gabriel** 6:1,5 |
| **derek** 23:25 | **enforcement** 8:16 8:25 9:2 | **feel** 17:5 | **gain** 22:10 |
| **description** 4:9 | **engineering** 8:12 8:14 | **fell** 20:11 | **gained** 22:10 |
| **desoto** 34:3,5 | **enterprise** 13:5 | **felony** 18:16,17 | **gaines** 12:24 13:9 13:13,22 |
| **died** 25:23 | **errata** 4:22 35:1 36:10,12,13 | **field** 9:10 | **general** 6:16 29:20 |
| **different** 25:7 | **especially** 28:13 | **filed** 5:7 17:25 18:2 31:22 | **george** 23:24 24:1 25:10,14,17,21,21 |
| **differentiate** 29:23 | **esq** 3:4,10 | **finally** 21:20 | **getting** 21:20 |
| **differently** 31:12 | **et** 1:8 36:3 | **find** 30:25 31:7 | **giant** 23:4 |
| **difficulty** 24:7 25:5 26:6 | **everybody** 28:12 28:13 | **finish** 7:16,19 | **give** 5:18 23:16 |
| **dillard** 7:5 | **everybody's** 28:12 | **finished** 8:2 | **given** 5:11 20:8 |
| **directed** 30:20 | **ex** 6:7,7 | **fire** 11:9 | **giving** 23:13,14 32:19 |
| **disciplined** 12:5 | **exactly** 20:3 | **firearm** 19:19 | **go** 8:4,7,18 14:19 15:11 29:20 |
| **disposed** 2:11 | **examination** 4:3 5:4 | **firearms** 19:20 | **going** 14:8 19:3 21:3 32:4,23 |
| **disrict** 1:1 | **examined** 5:3 | **firm** 3:4,20 | **good** 11:21 14:2,5 14:22 20:16 29:11 |
| **distress** 17:18 | **excessive** 10:19 | **first** 5:2 8:24 16:23 | **grabbed** 22:8 |
| **district** 1:1 19:13 | **exchanged** 22:3 | **floorboard** 21:24 | **graduate** 15:20 |
| **division** 1:2 | **exclusive** 10:14 15:11,16 | **floyd** 23:24 24:1 25:10,15,18,21,22 | **graduated** 7:22 8:8 |
| **divorced** 7:8 | **executed** 13:13 | **follow** 27:18 29:15 30:16 | **grenada** 3:5 |
| **document** 19:6 34:15,16 | **exhibit** 4:8,9,10 19:4,7 | **followed** 30:10 | **grew** 29:1 |
| **drawn** 22:4 | **expected** 19:14 28:9 | **follows** 5:3 | **groceries** 11:21 |
| **drift** 20:13 | **expires** 34:24 | **force** 9:20,21 10:20 | **grocery** 11:5,6 |
| **drive** 3:5 | **f** | **forced** 12:2 | **ground** 22:6 |
| **dropping** 11:23 | **f** 34:1 | **foregoing** 34:7,8 34:10 | **gun** 21:21 |
| **due** 32:3,7 | **fact** 27:7 | **form** 2:10 24:3 | **gunshots** 22:2 |
| **duly** 5:2 | **failed** 21:4 | **formalities** 2:9 | **guys** 15:5,7 |
| **e** | | **forms** 2:9 | |
| **e** 3:1,1 4:1 6:3 12:24 34:1,1 | | **found** 20:5 31:8 | |
| **ears** 28:24 | | **friend** 14:2,5,11 | |

**h**

half 26:3
handcuffed 24:6
handcuffs 22:8
 26:22,24
handled 31:12
happen 26:24
 32:10
happened 9:8
 21:12,18 23:6
hattiesburg 8:23
head 14:15 20:6
hear 7:18 17:15
 21:21 26:13,25
 27:3
heard 12:18 16:22
 21:1 22:2 25:13
 27:6,7 28:19
hearing 2:12
heart 33:4
hello 25:2,15
hereto 19:8
high 7:16,19,21,22
highway 5:19
 20:23
history 32:15
hit 21:16
home 9:14
hope 32:21
human 28:12
husband's 7:6

**i**

idea 13:1
ignorant 31:19
immediate 10:3
immediately 8:5
 22:2,12,24
impressionable
 28:21

inaudible 9:11
incident 32:1
including 17:3,4
 24:5
index 4:3,8
individual 12:23
 13:16 19:22 26:4
industrial 8:14
information 25:7
informed 19:17
injured 31:25 32:7
injuries 32:2,22
inside 31:8
institute 8:20
interact 9:22
interest 34:13
internal 12:9
investigation 12:9
investigator 9:19
investigators
 19:15
involved 18:16
 22:19 34:13
irrelevant 17:8,9
ivy 19:17,25 20:4

**j**

jackson 20:11
jesse 14:3
jessica 3:10
jmalone 36:1
job 8:25 10:23
 11:1,3,6 12:3,6
jobs 9:2
joke 28:6
jonathan 12:23
 13:13,22
jumped 20:10
june 34:24
jury 32:12,14,17
 32:23 33:1

justice 3:11
justin 1:15 2:1 4:4
 4:10 5:1,14 35:2
 36:4

**k**

k 6:3
kayla 14:13
keep 14:8
kemp 10:9 27:3
kemper 7:24,25
 8:2 14:25 15:1,4
 16:2
kept 21:23
kerri 7:5
kind 17:18
knew 18:15,20
 28:1
know 11:22,24
 12:17 13:23 15:17
 17:6 27:5 28:3,4
 30:8,13 31:22
 32:11,15
knowledge 11:20
ks 1:6

**l**

land 9:9
lane 20:18
large 34:22
law 8:15,24 9:2
lawsuit 5:7 12:14
 12:15,20,25 31:22
lawsuits 13:5
laying 24:24 25:5
layoff 11:8
lcr 3:21 34:20
leadership 28:9
learn 27:12
left 9:9 11:13
legal 36:19

lewis 21:6,13
 23:11,15 24:5,14
 24:22 25:4,10,24
 26:18
lewis's 24:10,12
life 28:25
lights 31:16
line 35:4
little 20:23 25:11
 25:13
live 7:3,14
lived 28:25
lives 5:23 6:18
 17:11,16 28:14
living 7:10
local 14:12
locally 18:19
located 8:21
location 20:9
long 5:21 6:4
 14:23 25:24 26:1
 26:1,4 28:25
look 19:20
looked 23:21
looped 21:2
lose 11:6
lot 9:22
loud 16:22
lynda 20:11

**m**

m 6:3
maiden 6:2
mail.com 3:23
majoring 8:13
male 13:17
malone 3:10 33:7
man 25:11,13,20
 26:22 32:20,22
man's 25:25 26:19
 27:1,4,19 30:11,19
 31:20

[maneuver - quickly]

**maneuver** 21:11
**maneuvered** 32:4
**march** 18:5 19:1
**marijuana** 13:14
**marine** 30:1
**marked** 19:7
**market** 11:5
**marquis** 1:4 5:7
  13:22 18:9,10
  36:3
**married** 6:4 7:7
**matter** 17:11,16
  34:13
**maturity** 29:12
**mccarra** 10:4
**mean** 11:25 28:5
**member** 10:13
**memphis** 1:24
  3:22
**mentioned** 19:6
**meridian** 8:9 13:3
**met** 15:25
**michael** 10:4
**miles** 6:19 21:10
**military** 14:3,6
  15:20 29:1,19
**mindful** 22:1
**minor** 32:2
**minute** 26:3,3
**misled** 29:8
**mississippi** 1:1,8
  3:5,11 5:19 6:16
  7:14 34:3,5,22
**mississippi's** 32:15
**mistakes** 28:12
**moment** 21:9
**months** 5:22
**moore** 3:4 4:5 5:5
  5:6 19:3,9 33:6
**mother** 7:10,12

**motoring** 28:15
**move** 20:18
**mtp** 1:6

**n**

**n** 3:1 4:1 12:24
  16:5 17:6
**name** 5:6,13,15,25
  6:2,23,25 7:2,4,6
  12:23 13:3
**named** 12:15 14:3
  14:6,12
**names** 6:22 14:1
**narcotics** 9:19
**near** 20:14 31:7
**neck** 23:22 24:1
  25:23 26:19
**need** 11:12,16
**needs** 18:16
**neither** 16:3
**never** 16:15,19,25
  17:2,21
**north** 20:1,11,23
  20:25
**notarize** 36:11
**notary** 34:5,22
**note** 36:9
**noted** 34:8
**notes** 34:11
**notice** 2:3
**noticed** 22:9

**o**

**o** 6:3
**oath** 16:14,24 17:1
**objections** 2:10
**occur** 32:17,18
**october** 6:12 34:18
  36:2
**office** 19:13
**officer** 18:16
  23:11,15 27:19

**officers** 20:17,19
**offshore** 9:14
**oil** 9:10
**okay** 6:24 7:16
  8:15,24 9:22 10:6
  10:13 11:23 12:16
  13:6 14:4,7,14
  16:5 18:11,18
  19:2 23:6 26:10
  27:12 29:22 30:8
  30:25
**old** 6:13,14
**once** 22:7,10
**ongoing** 12:25
**order** 34:14
**organization**
  10:14
**overrun** 28:13

**p**

**p** 3:1,1
**p.m.** 2:5 33:10
**page** 4:9 35:4
**pages** 34:10 36:12
**part** 34:16
**participated** 22:15
**parties** 34:13
**pass** 20:19
**passed** 21:4,5
**passenger's** 21:23
**paying** 26:16
**pays** 10:11
**people** 11:25 15:1
  28:9
**performed** 21:11
**person** 31:4,5
**pit** 32:4
**place** 23:19 34:7
**placed** 23:17
**places** 20:2
**plaintiff** 1:5 2:3
  3:3 12:22

**play** 14:21,22,24
**played** 14:23
**police** 9:1,15 10:4
  10:12
**polly** 3:21 34:5,20
**pollywardlawccr**
  3:23
**position** 9:18
**possession** 13:14
  19:19 21:25
**possibility** 22:1
  23:5
**possible** 16:10
**possibly** 21:25
**prefer** 15:24 16:1
**pressure** 25:22
**pretty** 19:16 20:12
  22:12 23:12
**probably** 6:18
  14:16 26:3 28:7
  28:17 32:3
**problem** 13:21
**procedure** 2:8
**proceeding** 34:10
**proceedings** 34:7
**provisions** 2:7
**public** 8:19 28:15
  34:5,22
**pull** 21:20
**pursuant** 2:3,6
**pursuit** 18:10
  19:11 20:8 22:15
  22:15,19,20
**put** 24:22 25:10

**q**

**question** 2:11
  10:24 16:1 30:17
**questions** 5:9 33:7
**quick** 19:16 29:2
**quickly** 20:12

| | | | |
|---|---|---|---|
| **quitman** 5:19 7:22 9:1,15,17,18 10:12 14:25 16:1 19:23 | **relatives** 6:15 **remember** 16:11 16:12,18 19:21 20:3,4 21:8 23:11 24:9 | 15:22 16:3,4 **seal** 34:15 **search** 22:12 **searching** 19:24 **secure** 22:7 | 12:7,10,12 14:11 14:18 15:3,6,8,23 16:13 17:10,12,14 17:17,24 18:1,7,10 18:22,24 23:1 |
| **r** | **report** 18:11 24:11 24:12 27:13 | **see** 24:10 31:24 **seen** 22:6 31:16 | 24:21 25:3,8,19 26:8,20 27:20 |
| **r** 3:1 6:3 34:1 **racially** 10:14 15:11,16 **radio** 20:6 21:22 27:1 31:20 **ram** 21:14 **rammed** 32:5 **rawson** 1:15 2:1 4:4,10 5:1,14 6:1 6:23,25 35:2 36:4 **rawson's** 19:4 **ray** 14:6 **reaching** 21:23 **read** 24:12 35:4 36:6,8 **reads** 35:4 **realize** 29:12 **realized** 20:5 **really** 14:2,5,20 16:4 25:3,9 **reason** 24:16,17 24:25 **reasons** 35:4 **recall** 16:16,18,21 17:21 18:6 19:11 19:12 24:8 **received** 19:18 **refer** 16:20 **referenced** 36:5 **referring** 27:5 **regional** 8:19 **rehire** 11:14 **related** 34:13 **relative** 6:18 **relatively** 29:3,5 30:2 | **reported** 34:10 **reporter** 34:5,9 **reporter's** 4:20 **reporting** 1:23 3:20,21 **represent** 5:6 **representative** 9:20 **representing** 13:2 **represents** 13:4 **reproduction** 34:16 **reserved** 2:10 **resided** 5:21 **resign** 12:2 **rest** 21:19 **return** 36:12 **rig** 9:10 **right** 14:15 15:21 17:5,17 21:1 22:5 22:14,23 24:10 30:5,5,7,7 33:2 **route** 15:19 **rules** 2:7 36:14 **run** 23:18 **s** **s** 3:1 6:3 12:24 **safety** 8:20 **saith** 33:11 **saw** 22:14 **saying** 13:7 **says** 25:4 **school** 7:17,19,21 7:23 15:10,12,16 | **send** 15:15 **sense** 29:11 30:2,4 **sent** 15:13 **september** 1:16 2:2 **seriously** 30:16,19 30:23,24 **served** 29:1 **shape** 24:3 **sheet** 4:22 35:1 36:10 **shelby** 8:23 **sheriff** 10:9 26:25 27:3,6 30:19 31:19 32:19 **sheriff's** 9:3,23 30:11 **shocked** 27:12,15 **short** 9:10 **shortly** 21:4 **shots** 21:21 22:3 **shoulder** 23:23 **shut** 27:4 **side** 22:5 **sign** 18:21 36:6,11 **signature** 2:13 18:23 33:12 34:15 34:18,20 35:19 **signed** 36:17 **similar** 23:24 **sir** 5:12,17 6:8,10 7:9,15,18 8:1 9:7 9:24 10:15,18,21 11:2,15,18 12:1,4 | 28:1,7,18 29:1,6 30:12,14,21 31:13 33:5 **sister** 7:1 **sister's** 7:2,4 **situation** 23:25 25:10,15,18 31:11 **six** 5:22 **skidmore** 6:3 **smart** 27:16 **smith** 14:12 **solutions** 36:19 **somebody** 29:8 **somebody's** 28:20 29:9 **something's** 30:6 30:7 **sordid** 32:15 **sorry** 13:19 **sort** 23:2 **south** 6:16 7:14 8:22 21:10 **southern** 1:1 8:10 8:19 11:5 **spin** 21:12,17 **start** 9:4 **started** 20:12 21:14 22:12 25:12 **state** 5:13 34:3,22 **stated** 19:22 25:25 34:7 **statement** 4:10 13:20 18:12,14,15 18:17,19,20,21 |

19:4 24:23 26:9
26:12 27:5
states 1:1
stating 19:18
stenotype 34:10
34:11
steve 6:23
stolen 19:19,19
stomach 24:25
25:6
stop 21:3 26:21
stopped 31:15
street 3:11 20:11
strong 30:10
struggle 23:2
student 8:10
stuff 32:3
styled 34:8
subject 12:8
subscribed 35:20
sued 12:11,13
17:22,22
superior 27:19
sure 31:21
surrendered 22:24
sworn 5:2 35:20

t

t 34:1,1
take 30:15,18
taken 2:1,6 34:7
34:11
task 9:20,21
taught 29:25 30:1
team 15:2,5
technically 10:1
technology 8:14
teenager 11:4,11
tell 11:10,16,19
13:7 14:1 16:8,14
16:16,19 19:10
26:18,21 32:13

33:3,4,4
telling 29:8
tender 33:6
tennessee 1:24
3:22
terminated 10:22
10:25 11:4
terms 2:7
testified 5:3 24:22
testify 26:11
testimony 19:7
36:8
thank 17:17
thing 27:17
things 11:23 19:14
think 8:22 11:8
14:16 16:6,7 17:8
17:9 20:22 23:13
28:19,20 31:11,14
31:15,16,18 32:5
third 21:8
thought 22:2
three 17:13
tilman 1:4 4:10
5:7 13:22 18:9,10
19:11,18 20:2,24
21:17,23 22:6,11
22:16,18,20,24
23:3,18,20 24:4,14
24:18,23 25:4
26:5 28:15 31:1
31:12,22,24 32:24
36:3
time 9:11 16:23
17:22 19:23 21:2
27:6 28:11,25
34:7 36:15
timeframe 36:7
times 21:22
tip 19:18,22 21:24

today 6:14 31:18
todd 10:9
told 11:22 24:4,15
top 14:15
town 19:20
trained 29:19,22
training 30:2
transcript 34:11
35:1 36:5,16
transfer 8:12
trayor 14:3
tried 21:13
trouble 24:15,24
true 22:23 24:4
34:10,15
truth 32:13,21
try 21:3
trying 16:23 21:14
22:7,9 25:6 26:16
turn 18:5 20:24,25
turned 12:17
turning 21:1
two 10:1 14:10
20:14 21:5,10,21
22:2 28:16
tx 36:13
type 31:25

u

underneath 23:3
understand 13:19
27:9
united 1:1
university 8:10,12
unjust 29:14,15,21
29:23
unprofessional
27:17
usm 8:13
uttered 17:6

v

v 36:3
vehicle 19:25 20:1
20:8,13 21:16,21
21:24 22:13 31:8
31:9
vehicles 20:14,19
21:5,15,19 22:5,21
vehicular 32:3
verify 36:8
veritext 1:23 3:21
36:12,19
veritext.com.
36:13
vicinity 6:16
video 2:5
visible 32:22
vs 1:6

w

w 3:21 34:5,20
waived 2:9,14
33:12
want 32:24 33:2,3
wardlaw 3:21
34:5,20
warrant 13:10,11
13:12,15
way 20:6,22 24:3
31:25
weapon 22:4 23:5
30:25 31:7,8
weapons 21:25
weight 25:10
went 7:22,24 8:19
9:15 20:1,4,22
21:10
west 20:11
wet 28:23
white 10:10 13:16
15:7

**[whites - zoom]**

| |
|---|
| **whites** 32:16<br>**wife** 5:24 6:7,17<br>  14:13<br>**wife's** 5:25<br>**witness** 2:13 19:8<br>  33:6,8 34:18<br>  35:19 36:5,7,9,11<br>  36:15<br>**wives** 6:7<br>**word** 16:5,17,21<br>  17:2,4,7<br>**words** 17:13,19<br>  19:10<br>**work** 9:15,16<br>  11:11 21:15<br>**worked** 9:9<br>**workers** 18:2<br>**wound** 20:15<br>  23:13<br>**wrong** 30:5,6,6,6<br>**wrongful** 12:21<br>  13:7<br>**wrongfully** 13:10<br>**www.veritext.com**<br>  1:25 3:24 |
| **x** |
| **x** 4:1 |
| **y** |
| **y'all** 29:22<br>**yeah** 29:12 32:6<br>**year** 7:16,19,23,23<br>**years** 6:14 28:16<br>  28:17<br>**young** 28:23 29:3<br>  29:5 |
| **z** |
| **zoom** 2:5 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.